**UNITED STATES OF AMERICA**                :

                                            :        ss:  New Haven, Connecticut

**COUNTY OF NEW HAVEN**                     :


<u>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**</u>


I, Timothy McKeon, a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of property, specifically, the electronic devices described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.  Both attachments are herein incorporated by reference.

2.      I am a deputized Task Force Officer with the DEA and am currently assigned to the New Haven District Office Tactical Diversion Squad, which is comprised of personnel from the DEA, the Wilton Police Department, the Wallingford Police Department, the Hamden Police Department, the Monroe Police Department, the Bristol Police Department, New Haven Police Department, Milford Police Department and the Shelton Police Department.  I have been a DEA Task Force Officer for approximately one month.  I have also been employed as a Police Officer in the State of Connecticut since October of 2005.

3.      During my tenure as a Police Officer and as a Task Force Officer, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking.  I also have received instruction relative to conducting drug investigations while attending numerous classes, seminars, and conferences, and the Police Officer Standards and

1

Training Academy in Milford, Connecticut. I have executed search warrants, which have resulted in the seizure of illegal drugs and evidence of drug violations. Over the past twelve years in law enforcement, I have participated in numerous investigations involving individuals suspected of distributing illegal drugs; coordinated controlled purchases of illegal drugs utilizing confidential informants, cooperating witnesses, and undercover police officers; obtained, and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs; conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution; analyzed records documenting the purchase and sale of illegal drugs; and spoken with informants and subjects, as well as other local, state, and Federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. In addition, I also receive periodic in-service training relative to conducting drug investigations. As a result of my training and experience, I am familiar with the behaviors, methods, and common practices of persons and organizations that illegally traffic and distribute controlled substances, as well as the devices commonly utilized by them.

4. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am the co-case agent on the investigation which is the subject of this affidavit and have personally participated in the investigation concerning violations of the federal laws listed in this affidavit.

5. Based upon information known to me as a result of my participation in this investigation, as well as information provided by other sources whom I have determined to be

2

accurate and reliable, I am familiar with the information discussed herein. Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated.

6.     The statements contained in this affidavit are based, in part, on information obtained through: (a) my personal participation in this investigation; (b) other law enforcement officers and their reports; (c) witness interviews; (d) physical surveillance and GPS data; (e) a review of seized materials and documents; and (f) my experience and training.

7.     Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance search warrants, I have not included each and every fact known to me regarding this investigation. Rather, I have set forth only those facts that I believe are sufficient to establish probable cause.

### Identification of the Devices to Be Examined

8.     The items to be searched (collectively, the "**Target Devices**"), which are specifically described in Attachment A, include the following:

1.     One (1) White Apple iPhone 4S Model A1387 ███████████████████████ ("**Target Device 1**");

2.     One (1) Black Blu Smart Phone ("**Target Device 2**");

3.     One (1) Black Samsung Model SGH-T401G ██████████████ ("**Target Device 3**");

9.     **Target Devices 1, 2 and 3** were seized on October 6, 2017, during the execution of the arrest warrant of ███████, and are currently stored in evidence at the DEA's New Haven District Office. On October 5, 2017, United States Magistrate Judge Sarah A. L. Merriam

from the District of Connecticut, signed a warrant authorizing the arrest of ▓▓▓▓▓. On October 6, 2017, members of the DEA New Haven District Office located ▓▓▓ arriving to a state court appearance in Stamford, Connecticut, and placed him under arrest without incident. **Target Devices 1**, **2, and 3** were found by investigators during the search incident to arrest of ▓▓▓▓'s vehicle, a white ▓▓▓▓▓ registered to ▓▓▓▓▓. All three **Target Devices** were found inside of ▓▓▓▓'s vehicle and were seized for evidentiary purposes.

10.     The **Target Devices** described in Attachment A are currently in the custody of the DEA in New Haven, Connecticut. The applied for warrants would authorize the DEA to conduct forensic examinations of the devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## Background

11.     This investigation by the DEA's New Haven District Office's Tactical Diversion Squad involves the investigation into the suspected heroin/fentanyl overdose of a twenty-one-year old male occurring in Fairfield, Connecticut on or about June 29, 2017. The name of the twenty-one-year old male is known to me, and he is referred to as VICTIM throughout the course of this affidavit. During the course of the investigation, investigators have analyzed telephone toll records, analyzed telephone text messages, conducted commercial and government database checks and reviewed previously written law enforcement reports.

## PROBABLE CAUSE

12.     On June 29, 2017, at approximately 5:32 AM, members of the ▓▓▓▓ Police Department and emergency medical services responded to a suspected drug overdose at a residence in ▓▓▓▓ Connecticut. Investigators identified that the VICTIM was not breathing,

4

did not have a pulse, and was lying on the floor. While at the residence, emergency medical personnel pronounced the VICTIM deceased at 5:46 a.m. Seized from the residence with the VICTIM's mother's consent were various drug and non-drug items, including a cellular telephone belonging to the VICTIM, a white powdery substance contained within silver foil, a cut straw (which I know from my training and experience to be an item that can be used to ingest illegal drugs), and an additional white powdery substance that was formed into a line on top of the VICTIM's dresser within his room. It was later determined through the State of Connecticut, Division of Scientific Services, that both white powdery substances tested positive for heroin and fentanyl.

13.     A post-mortem toxicology report found fentanyl, heroin, and THC in the VICTIM's system. Fentanyl is a Schedule II controlled substance, and heroin is a Schedule I controlled substance.  THC is a chemical found in marijuana.  An autopsy performed by the Office of the Chief Medical Examiner for the State of Connecticut concluded that the VICTIM died from acute intoxication due to the combined effects of fentanyl and heroin.

### Interview of Witness #1 (Minor Sibling)

14.     On June 29, 2017, members of the ▮▮▮▮▮ Police Department spoke with WITNESS #1, who advised that she had last seen the VICTIM on June 29, 2017, at approximately 12:30 a.m. WITNESS #1 further advised that the VICTIM entered the house through the kitchen door around that time and said hello to her while she watched television. WITNESS #1 then heard the VICTIM go upstairs.

5

**Interview of Witness #2 (Mother)**

15.    On June 29, 2017, members of the ▆▆▆▆ Police Department spoke with WITNESS #2, who advised that she had not seen the VICTIM the night before his death, but did hear the VICTIM going downstairs at approximately 1:45 a.m. WITNESS #2 advised that she thought that he was louder than usual. WITNESS #2 further advised that it was not unusual for the VICTIM to go downstairs late at night to make some food, but she did think that his footsteps and movements were louder than normal. WITNESS #2 advised that she almost got up to check on the VICTIM, but then did not.

**Interview of Witness #3 (Friend of Victim)**

16.    On July 18, 2017, law enforcement officers interviewed WITNESS #3, a friend of the VICTIM. WITNESS #3 stated he/she has known the VICTIM for approximately six years. WITNESS #3 stated the VICTIM has been using illicit drugs since high school. WITNESS #3 stated that he/she was contacted by the VICTIM on or about June 28, 2017.  WITNESS #3 believes that the VICTIM was attempting to buy drugs the night before his death, and sometime during the night the VICTIM left the residence, bought heroin, used it, and died. To the best of WITNESS #3's knowledge, the VICTIM had been using a drug dealer who went by the name of ▆▆▆▆ and resided in ▆▆▆▆ WITNESS #3 had also purchased drugs from ▆▆▆▆ many times in the past. WITNESS #3 advised that he/she had purchased heroin, Oxycodone 30 mg tablets and Xanax from ▆▆▆▆" WITNESS #3 knows that, based on a text message conversation with the VICTIM, the VICTIM was attempting to purchase Oxycodone 30 mg tablets from ▆▆▆▆ a day or two prior to the VICTIM's death.  WITNESS #3 stated that ▆▆▆▆ resides at ▆▆▆▆ in ▆▆▆▆. WITNESS #3 described ▆▆▆▆ as a



████████████████████████████████████

████████████, WITNESS #3 further advised that ████████ true name is ████████

WITNESS #3 gave written consent to investigators to forensically extract data from his/her iPhone.

## Analysis of Witness #3's Cellular Telephone

*Telephone Call/Text History*

17.     During the course of this investigation, the cellular telephone utilized by WITNESS #3 was provided to investigators. Members of the DEA analyzed the electronic contents of the telephone. Investigators analyzed the telephone text message between WITNESS #3 and others. Specifically, telephone text message conversations coupled with voice calls were identified in which WITNESS #3 and ████ discussed drug transactions involving the purchase and sale of heroin, oxycodone, Percocet (which is a brand of oxycodone), and Xanax.

18.     For example, beginning on June 7, 2017 and ending on June 8, 2017, WITNESS #3 had the following text message and phone call exchange with the cellular number ████████ ████, listed under the name ████████ in the contacts of the cellular phone belonging to WITNESS #3:

WITNESS #3: I'm gonna be in Connecticut from 11am – 2 pm tomorrow, let me know if you can get any percs / dope (6/7/17 @ 11:04:04 pm)

WITNESS #3: Outgoing call to ████, which lasted 7 seconds (6/8/17 @ 12:53:56 pm)

WITNESS #3: Yoooo (6/8/17 @ 2:30:19 pm)

████: Yo (6/8/17 @ 2:40:57 pm)

WITNESS #3: Outgoing call to ████, which lasted 3 minutes and 29 seconds (6/8/17 @ 2:41:08 pm)

WITNESS #3:  Come thru to Bridgeport if you can man (6/8/17 @ 2:57:57 pm)

WITNESS #3:  I'm in a bit of a hurry, pls let me know if you can meet him right around 3:30 (6/8/17 @ 2:58:14 pm)

WITNESS #3:  Pleaseeee yo do me a solid it's been a month since I've done shit ya feel me (6/8/17 @ 3:03:02 pm)

████: Got u (6/8/17 @3:03:43 pm)

WITNESS #3:  Please help me out today mike it'd mean a lot (6/8/17 @ 3:04:05 pm)

WITNESS #3:  When you gonna be up here you think? (6/8/17 @ 3:10:29 pm)

WITNESS #3:  What's the word you think? (6/8/17 @ 3:21:01 pm)

WITNESS #3:  Outgoing call to ████, which lasted 4 seconds[1] (6/8/17 @ 3:24:09 pm)

WITNESS #3:  Outgoing call to ████, which lasted 3 seconds (6/8/17 @ 3:29:56 pm)

WITNESS #3:  Outgoing call to ████, which lasted 1 minute and 15 seconds (6/8/17 @ 3:35:32 pm)

WITNESS #3:  You on your way? (6/8/17 @ 3:47:20 pm)

████: About to be (6/8/17 @ 3:49:20 pm)

████: Tryi g to the this money toggyer (6/8/17 @ 3:55:36 pm)

---

[1] I know from my training and experience that telephone calls of this duration (3-8 seconds) are likely calls in which the recipient did not pick up the line or in which the call was sent to voicemail.

8

WITNESS #3:  Aight brotha (6/8/17 @ 4:00:40 pm)

WITNESS #3:  Waiting on yo asssss (6/8/17 @ 4:14:21 pm)

███: Outgoing call to WITNESS #3, which lasted 1 minute and 29 seconds (6/8/17 @ 4:18:15 pm)

███: Outgoing call to WITNESS #3, which lasted 25 seconds (6/8/17 @ 4:28:15 pm)

WITNESS #3:  3535 park avenue (6/8/17 @ 4:28:45 pm)

WITNESS #3:  Outgoing call to ███, which lasted 16 seconds (6/8/17 @ 4:48:58 pm)

███: Outgoing call to WITNESS #3, which lasted 12 seconds (6/8/17 @ 4:59:01 pm)

███: Outgoing call to WITNESS #3, which lasted 1 minute and 21 seconds (6/8/17 @ 8:33:37 pm)

19.     Based on my training, experience and knowledge of this investigation, I believe that, when WITNESS #3 asked ███ if he could "get any percs / dope" he/she was asking ███ if he/she could get any prescription narcotic pain relievers or heroin.  I believe that, when ███ replied, "Got u" he was advising WITNESS #3 that he was able to sell him/her either substance.  I believe that when WITNESS #3 was asking "You on your way?" at 3:47:20 pm, WITNESS #3 was checking to see if ███ was going to be on time to sell him/her the drugs.  ███ replied with "Tryi g to the this money toggyer" which I believe based on my training and experience, means that ███ was picking up money from customers to whom he fronted drugs and was getting enough money together to buy a large quantity of narcotic pain relievers and

9



heroin.  I also believe, based on my training and experience, that [REDACTED] called WITNESS #3 at 4:28:15 pm to ask WITNESS #3 where to meet him/her. WITNESS #3 texted [REDACTED] and told him to meet him/her at [REDACTED].

20.     On June 19, 2017, WITNESS #3 sent the following text message and placed two phone calls to cellular number [REDACTED] phone), listed under the name [REDACTED] in the contacts of the cellular phone belonging to WITNESS #3:

> WITNESS #3:  Outgoing call placed to [REDACTED], which lasted 40 seconds (6/19/17 @ 1:49:52 pm)
>
> WITNESS #3:  Outgoing call placed to [REDACTED], which lasted 3 seconds (6/19/17 @ 1:51:42 pm)·
>
> WITNESS #3:  He'd want 4 of them / 120 mg (6/19/17 @ 1:51:57 pm)

21.     Based on my training, experience and knowledge of this investigation, I believe that WITNESS #3 had originally called [REDACTED] and asked him if an acquaintance of WITNESS #3 could get some narcotic pain relievers from [REDACTED]. The second call was terminated after 3 seconds, indicating that WITNESS #3 and [REDACTED] did not have a conversation. WITNESS #3 then followed up the conversation by texting [REDACTED] the amount of pills that his/her friend would want and indicated that his/her friend wanted "4 of them / 120 mg," which I believe, based on my training and experience, means 4 oxycodone 30 mg tablets, equivalent to 120 mg total.

## Analysis of the Victim's Telephone

*Telephone Call History*

22.     During the course of this investigation, the cellular telephone utilized by the VICTIM was provided to investigators. Members of the DEA analyzed the electronic contents of the telephone, including deleted text messages, deleted call history and contact information.

Investigators analyzed the deleted telephone text message between the VICTIM and telephone number ███████, the telephone number associated with the name ███████ was found in the VICTIM's cell phone contacts. Specifically, telephone text message conversations coupled with voice calls were identified in which the VICTIM and ██████ aka ████████' discussed drug transactions involving the purchase and sale of Xanax and heroin. I reviewed the following deleted text message exchanges occurring between the VICTIM and telephone number ████████ ████████ on the following dates:

**JUNE 25, 2017  beginning at 6:15:02 PM**

VICTIM: "yo"

VICTIM: "You got xans?"

████: "Yeah"

VICTIM: "Could I scoop?"

*Tolls show an attempted voice call was placed by* ██████ *to the VICTIM at 7:30:29 PM (length of call 00:00:04).*

*Tolls show an attempted voice call was placed by the VICTIM to* █████ *at 7:30:48 PM, which went to voice mail (length of call 00:00:04).*

████: "I'm driving"

*Tolls show an attempted voice call was placed by* ██████ *to the VICTIM at 7:42:21 PM (length of call 00:00:03).*

VICTIM: "Call me when you can"

*Tolls show a voice call was placed by* █████ *to the VICTIM at 7:42:36 PM (length of call 00:00:46)*

11

VICTIM: "Yoyo lmk when I can come pick up

*Tolls show an attempted voice call was placed by the VICTIM to* ▮▮▮ *at 8:26:11 PM, which went to voice mail (length of call 00:00:03).*

*Tolls show an attempted voice call was placed by the VICTIM to* ▮▮▮ *at 8:32:20 PM, which went to voice mail (length of call 00:00:01).*

VICTIM: "Trying to grab 11 of them"

*Tolls show a voice call was placed by the VICTIM to* ▮▮▮ *at 8:37:58 PM (length of call 00:01:23).*

*Tolls show an attempted voice call was placed by* ▮▮▮ *to the VICTIM at 9:29:27 PM (length of call 00:00:08).*

*Tolls show an attempted voice call was placed by* ▮▮▮ *to the VICTIM at 9:30:04 PM (length of call 00:00:08).*

*Tolls show a voice call was placed by the VICTIM to* ▮▮▮ *at 9:30:51 PM (length of call 00:00:43).*

Based on my training and experience this appears to be a typical drug deal that took place between the VICTIM and ▮▮▮ I believe that when the VICTIM asked ▮▮▮ if he had "Xans," he was referring to Xanax 2 mg tablets, which is the typical dosage for street-level Xanax sales. ▮▮▮ answered "yeah" advising that he could sell the VICTIM Xanax tablets. I believe that after the initial texts, the VICTIM contacted ▮▮▮ to arrange to meet ▮▮▮. Based on my training and experience, I know that it is typical for dealers and buyers to connect with each other by phone to agree on a meet spot.

**June 27, 2017**

12

It should be noted that retrieval of deleted text messages and calls from this cell phone extraction only captured one side of this conversation between the VICTIM and ▮▮▮▮▮▮▮ ▮▮▮▮▮. I compared the extraction results with toll records provided by the service provider for ▮▮▮▮'s phone on the date in question and observed that texts and phone calls were returned from ▮▮▮▮ during the below conversation (though the content of the text messages is unavailable). The following is a verbatim list of texts from June 27, 2017 captured from the extraction:

VICTIM: "Save me 3bags man" (12:27:44 AM)

▮▮▮▮: *(outgoing text message sent to VICTIM; content unknown)*

VICTIM: "No doubt shit happens" (12:52:44 AM)

VICTIM: "Smoked sum, had a couple beers, and still don't even feel slightly geeked" (3:23:50 AM)

VICTIM: "Just call me when u wake up im finna scoop that other stuff" (6:14:56 AM)

*Tolls show a voice call was placed by ▮▮▮▮ to the VICTIM at 3:16:26 PM (length of call 00:06:56)*

VICTIM: "Ayo shoot me a text when you get em. I just want make sure everything's good. I'll call you at 11:30" (8:02:48 PM)

VICTIM: "Send me a picture when you get a chance. I can tell from that" (8:39:30 PM)

VICTIM: "Cmon bro I gave u all that $$" (10:46:35 PM)

VICTIM: "Let me know if you have more than 3 of those" (11:04:00 PM)

**JUNE 28, 2017 (*conversation continued from June 27, 2017*)**

VICTIM: "You buggin me out bro that's my bread I need you to call me" (12:04:29 AM)

VICTIM: "Call me tomorrow man I don't want to have to do anything drastic or nothing

man but I'm not gonna just let 2hunnid walk" (12:52:48 AM). It should be noted that this text was sent at 12:52 AM, and it is my belief that the VICTIM meant later that day on the 28th when he told ████ to call him "tomorrow."

   VICTIM: "Need to grab my money tonight. What time works for u" (4:45:30 PM)

   VICTIM: "Cmon man that's not just my money I got people bugging out on me" (6:16:41 PM)

   VICTIM: "Bro what's good this is getting crazy" (7:23:07 PM)

   *Tolls show a voice call was placed by* ████ *to the VICTIM at 7:45:02 PM (length of call 00:01:17)*

   VICTIM: "Yo man what time u coming up?" (9:10:30 PM)

   VICTIM: "Yo I need this money man what is going on" (9:44:44 PM)

   *Tolls show a voice call was placed by* ████ *to the VICTIM at 9:59:32 PM (length of call 00:04:37)*

   *Tolls show a voice call was placed by the VICTIM to* ████ *at 11:49:48 PM (length of call 00:06:26).* This is the last contact between the VICTIM and ████ before the VICTIM's death.[1]

   23.   Based upon my training and experience and upon my knowledge of this investigation, I believe that the VICTIM's first message to ████ stating "Save me 3bags man" at 12:27:44 AM on June 27, 2017, indicates that the VICTIM was asking ████ to save him (the VICTIM) three bags of heroin, as heroin is typically packaged in bags. During the remainder of the conversation, the VICTIM and ████ were arranging to meet one another for the purposes of completing a drug transaction. I also believe that the VICTIM had fronted money to ████ and

_____

[1] Around this time, the VICTIM was also communicating via text message with another friend, but their conversation did not concern drug activity.

14

was concerned that he wasn't going to get the drugs, and was asking for his money back if ▇ didn't have the drugs for him.

24.     Based on the phone records and witness interviews, it appears that the VICTIM and ▇ last spoke at 11:49 p.m. for six minutes. The VICTIM's whereabouts during this phone call are unknown. According to Witness #1, the VICTIM walked into his house at around 12:30 a.m. At approximately 5:32 a.m., Witness #2, the VICTIM's mother, called 911 after finding her son passed on out the kitchen floor. He was pronounced dead shortly thereafter.

**Conversation Between Victim and Witness #3**

25.     The following is a verbatim exchange between the VICTIM and WITNESS #3 on between 7:13 p.m. June 27, 2017, and 7:28 p.m. on June 28, 2017, which was extracted from both the VICTIM's and WITNESS #3's phones:

VICTIM: "Yo I floated ▇ like 215 so he could pick up while he's at work and I'm a little sketched about it not gonna lie"

VICTIM: "He's supposed to be back around 12 with 8blues for me"

VICTIM: "I said over and over like 'your so hard to get in touch with and most of the time don't answer my calls that shit better not go down'"

VICTIM: "You think I'm good?"

WITNESS #3: "Yeah you should be straight"

WITNESS #3: "He kinda fucked with ▇ s money when ▇ was at school"

WITNESS #3: "Sent him like $600 to get shit through the mail and it took loyal like a month to just return him his money, never got the blues"

VICTIM: "I'll lyk how it goes"

15

WITNESS #3: "Word word"

VICTIM: "Yeah I'm pretty sure he called about that as well"

VICTIM: "He was in Florida and wanted me to send him $300 so he could pay to see a doctor and get some"

VICTIM: "I was like nah, sounds too sketch, ur mad far away, and if I'm getting shit sent I want it done from a pro on the markets not u lol"

WITNESS #3: "Yup exactly"

VICTIM: "He just called me like 20min ago and said he popped 2 of the 50 he picked up and wasn't feeling much after 20-30min and wanted to return them"

VICTIM: "When shit like that happens the whole thing starts to feel off/sketch, but I was like honestly I want them so bad I'll take my 8 and see myself"

VICTIM: "But I could tell he was fucked up when I linked with him somewhat and idk I don't trust his opinion very much lol"

WITNESS #3: "Lmao"

WITNESS #3: "True shit"

WITNESS #3: "You should be straight"

WITNESS #3: "██████████ has OP 20s rn"

VICTIM: "Hm"

VICTIM : "If this doesn't go I might grab those and soak em in coke"

VICTIM: "Are they 20 each?"

WITNESS #3: "Yea"

VICTIM: "Beat"

VICTIM: "I'm getting 8 ms @27 tn if it works"

WITNESS #3: "They're straight though like my boy FaceTime'd me like I'm fuckeddddd up and he has a high ass tolerance"

WITNESS #3: "Word that's legit"

VICTIM: "Yeah true"

VICTIM: "███ hasn't answered any of my calls/texts in the last month"

VICTIM: "Figured he was in rehab"

VICTIM: "Last I saw him in January he said he was trying to go"

VICTIM: "So ███ called me around 11, said the blues were fake and he wasn't buying em and assured me I'd get my bread back, now haven't gotten a call or text back and I been blowing him up"

VICTIM: "I just don't really trust the guy at all so I'm bugging trying to pick my money up tonight because I don't want it in his hands until tmr u feel?"

VICTIM: "Now he's got me nervous"

VICTIM: "Let me know if you can get in contact with him tomorrow or something cuz this is fucked"

VICTIM: "Imma have to bust up his car or something"

VICTIM: "Yoooo"

VICTIM: "Can u try and hit him up for me? We spoke this morning but now my calls are going straight to voicemail"

VICTIM: "I have a feeling he blocked my number or some shit"

WITNESS #3: "Yea lemme try"

17

VICTIM: "Cool thanks so much man"

VICTIM: "If it doesn't go straight to voicemail he def blocked my number"

WITNESS #3: "It went straight to voicemail"[1]

VICTIM: "Ok that makes me feel a little better"

VICTIM: "Idk what to do I have a feeling I'm not gonna see that money for a while"

VICTIM: "And it was straight up my last 210$ I have like 1.47$ in my bank rn"

26.    Based upon my training and experience and upon conferring with WITNESS #3, I believe that the VICTIM had negotiated with ████, aka ████, to purchase eight (8) oxycodone 30 mg tablets for a price of $27 each. I also believe that ████ was not able to get the oxycodone tablets.

**Identification of ████**

27.    On July 17, 2017, an investigating officer showed a photo of ████ to Lieutenant Chris Baker of the Stamford Police Department. Lieutenant Baker immediately identified the subject in the photo as ████. Lieutenant Baker also advised that ████ was an active member of the ████.

28.    An investigating officer also showed WITNESS #3 a photo of ████ and WITNESS #3 immediately identified the subject in the photo as ████, the same person that WITNESS #3 had bought drugs from numerous times in the past.

29.    On July 28, 2017, members of the DEA issued an administrative subpoena to AT&T Wireless, requesting subscriber information and telephone toll records for telephone number ████ phone. Subscriber information for the telephone was listed as

---

[1] Toll records from VICTIM 3's phone and ████'s phone shows that WITNESS #3 placed an outgoing call to ████'s phone at this time.



████████ with an address of ████████████. The telephone was listed as a

postpaid telephone.

  30. On October 5, 2017, United States Magistrate Judge Sarah A.L. Merriam

authorized an arrest warrant for ████ She also authorized a search warrant for the cellular

telephone assigned to phone number ██████, which was believed to be in ████'s

possession.

  31. On October 6, 2017, agents executed the arrest warrant for ████ and seized a

cellular telephone from ████████'s person, incident to arrest. This cellular phone, a black

and silver Apple iPhone 6S, was called by agents at the time of arrest and was confirmed to be

assigned to phone number ██████. ████ provided agents with the passcode for this

device and agents subsequently download and extracted the information stored. The data revealed

usage of this device beginning in early March 2017 until ████'s arrest. There were pertinent text

message conversations regarding drug supply and distribution; however, data usage of both text

messages and call logs terminated approximately April 23, 2017, and resumed approximately

October 2, 2017. Due to the aforementioned toll records and witness information, it is suspected

that ████ was using another phone during the missing time period.

  32. Given my training and experience, I know that distributors of illegal drugs use

cellular telephones to further their drug distribution activities. Distributors of illegal drugs

typically carry multiple cellular telephones so that they can converse with people involved in

different facets of their illegal activity through different phone numbers. For instance, I know

from my training and experience that drug dealers may carry one phone to converse with

customers and another phone or phones to converse with the individuals who supply the drugs to

them. Having multiple phone numbers also makes it more difficult for law enforcement to track and apprehend those who are involved in drug distribution activities.

33.     These communications often involve the use of traditional telephone calls and text messaging. With respect to this investigation, I have reviewed the telephone toll records, including the telephone calls and telephone text messages, utilized by ▮▮▮▮. Given the duration and frequency of the telephone calls and given the variance between the telephone calls and telephone text messages, I believe that the text message communications as well as voice calls were completed in furtherance of ▮▮▮▮'s drug distribution activities. Given my training and experience, and knowledge of this investigation, I believe that ▮▮▮▮ used his cellular telephones to communicate via traditional telephone calls and text messages in furtherance of his drug distribution activities. I believe that the three additional phones that were seized from ▮▮▮▮'s vehicle at the time of his arrest, the **Target Devices**, will contain evidence of ▮▮▮▮'s drug trafficking activities.

## INFORMATION REGARDING CELLULAR TELEPHONES AND THE REQUSTED SEARCH WARRANT

34.     Based on my training, experience, I know that the aforementioned **Target Devices** may have some or all of the capabilities that allow them to serve as wireless telephones, digital cameras and video recorders, portable media players, global positioning system (GPS) navigation devices, hand-held radios, and personal digital assistants (PDA). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

35.     With regards to the **Target Devices**, I request permission to search the **Target Devices** for evidence relating to the drug-related overdose of the VICTIM and the unlawful distribution, and the possession with intent to distribute, of narcotics, including evidence of communications between ███ and other co-conspirators involved in the distribution of narcotics as well as other criminal acts.  Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics, or conspire to do so.  Also based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics. Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics, the quantity of narcotics and/or shipping packages within which the narcotics are concealed, and firearms, as firearms are generally considered tools of the trade in narcotics activity. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics:

a.     the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

b.     the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

c.     descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

d.     any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;



e.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said devices;

h.  internet browsing history, to include, internet searches in the memory of said device;

i.  images and videos in the memory of said device; and

j.  evidence of user attribution showing who used or owned said device at the time particular items were edited or deleted such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

23.  It is also requested that the Court authorize the retrieval of the above described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.  I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant.  Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure.  Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

24.  It is also requested that warrant be deemed executed once the **Target Devices** has been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25.     The warrant applied for with respect to the **Target Devices** would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26.     As described above and in Attachment B, this application seeks permission to search and seize things that the **Target Devices** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27.     Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the DEA,

or other involved law enforcement agencies intend to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B. Based on the foregoing, the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.

## CONCLUSION

28.     I submit that this affidavit supports probable cause to search the **Target Devices** described in Attachment A for the items described in Attachment B (evidence, fruits, and instrumentalities of the crimes for violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute and Distribution of Narcotics), 21 U.S.C. § 846 (Conspiracy to Distribute Narcotics), and 21 U.S.C. § 843(b) (Use of a Telecommunications Facility in the Distribution of Narcotics)).

Timothy McKeon
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me this 20th day of October, 2017.

/s/ Joan G. Margolis

Honorable Joan G. Margolis
United States Magistrate Judge
District of Connecticut

24

**ATTACHMENT A**

The devices to be searched are as follows:



1.   A white Apple iPhone 4S with serial numbers ████████████, seized from the vehicle of ████████████ on October 6, 2017 ("**Target Device 1**");

2.   A black Blu smart phone, seized from the vehicle of ████████████ on October 6, 2017 ("**Target Device 2**");

3.   A black Samsung smart phone, model SGH-T401G with IMEI ████████████ seized from the vehicle of ████████████ on October 6, 2017 ("**Target Device 3**").

Since their seizure, all of these devices have been stored in the DEA's New Haven District Office's evidence storage.

**ATTACHMENT B**

All records contained in the Target Devices identified in Attachment A, pertaining to violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute and Distribution of Narcotics), 21 U.S.C. § 846 (Conspiracy to Distribute Narcotics), and 21 U.S.C. § 843(b) (Use of a Telecommunications Facility in the Distribution of Narcotics), including:

1. the telephone number, ESN number, serial number, and SIM card number of the subject telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the subject telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes (violations of 21 U.S.C. §§ 841(a)(1) and 846);

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the subject telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the subject telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said subject telephone;

8. internet browsing history, to include, internet searches in the memory of the subject telephone;

9. images and videos in the memory of the subject telephone; and,

10. evidence of user attribution showing who used or owned the subject telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

26

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described subject telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.